No. 23-10168

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

IN RE RYAN, et al.,

*Petitioners.*

_____

On Petitions for Mandamus from the United States District Court
for the Northern District of Texas,
No. 4:21-cr-005-O

_____

## THE BOEING COMPANY'S RESPONSE TO PETITIONS FOR
## WRIT OF MANDAMUS

_____

BENJAMIN L. HATCH
BRANDON M. SANTOS
McGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006

MARK R. FILIP
CRAIG S. PRIMIS
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004

JEREMY FIELDING
KIRKLAND & ELLIS LLP
1601 Main Street
Dallas, Texas 75201

PAUL D. CLEMENT
 *Counsel of Record*
C. HARKER RHODES IV[*]
MARIEL A. BROOKINS[*]
CLEMENT & MURPHY, PLLC
706 Duke Steet
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Respondent The Boeing Company*

March 27, 2023

# CERTIFICATE OF INTERESTED PERSONS

*In re Ryan*, No. 23-10168

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

- Applebaum, Erin R. – counsel for Petitioners Naoise Connolly Ryan, Emily Chelangat Babu, Joshua Mwazo Babu, Catherine Berthet, Huguette Debets, Luca Dieci, Bayihe Demissie, Sri Hartati, Zipporah Kuria, Javier de Luis, Nadia Milleron and Michael Stumo, Chris Moore, Paul Njoroge, Yuke Meiske Pelealu, John Karanja Quindos, and Guy Daud Iskandar Zen S. ("Individual Petitioners")

- Armstrong, Scott Philip – counsel for Respondent United States

- Auld, Marianne – counsel for district court Movant Erin Nealy Cox

- Babu, Emily Chelangat – Petitioner

- Babu, Joshua Mwazo – Petitioner

- Bass, Katie D. – counsel for Petitioner Smartwings A.S. ("Smartwings")

- Battista, Anthony – counsel for Petitioner Polskie Linie Lotnicze Lot S.A. ("LOT")

- Benton, Colin Patrick – counsel for Petitioner LOT

- Berthet, Catherine – Petitioner

- The Boeing Company ("Boeing") – Respondent

- Brammeier, Tracy A. – counsel for Individual Petitioners

- Brookins, Mariel A. – counsel for Respondent Boeing

- Burns, Warren T. – counsel for Individual Petitioners

- Cassell, Paul G. – counsel for Individual Petitioners

- Castillo, Callie A. – counsel for Petitioner Smartwings

- Clement, Paul D. – counsel for Respondent Boeing

- Clifford, Robert A. – counsel for Individual Petitioners

- Cox, Erin Nealy – district court Movant

- Cruz, Ted – district court *Amicus Curiae*

- Cullen, Richard – counsel for Respondent Boeing

- Debets, Huguette – Petitioner

- Demissie, Bayihe – Petitioner

- Dieci, Luca – Petitioner

- Dow, Mary – counsel for Petitioner LOT

- Drez, III, David J. – counsel for Petitioner LOT

- Duffy, Jerrob – counsel for Respondent United States

- Fielding, Jeremy A. – counsel for Respondent Boeing

- Filip, Mark – counsel for Respondent Boeing

- Ganjei, Nicholas Jon – counsel for district court *Amicus Curiae*

- Gilmore, Jeffrey Richard – counsel for Petitioner Smartwings

- Haney, Patrick – counsel for Respondent Boeing

- Hartati, Sri – Petitioner

- Hatch, Benjamin L. – counsel for Respondent Boeing

- Hatch, Ian Brinton – counsel for Respondent Boeing

- Hellberg, Jeffrey W. – counsel for Petitioner LOT

- Hilton, Chase – counsel for Individual Petitioners

- Jacobs, Cory E. – counsel for Respondent United States

- Kahn, Daniel S. – counsel for Respondent United States

- Kuria, Zipporah Muthoni – Petitioner

- Kwarta, Evan – counsel for Petitioner LOT

- Laryea, Lorinda – counsel for Respondent United States

- Lewis, Alex C. – counsel for Respondent United States

- Lope, Carlos Antonio – counsel for Respondent United States

- Luis, Javier de – Petitioner

- Marlin, Jason Robert – counsel for Individual Petitioners

- Meacham, Chad E. – counsel for Respondent United States

- Medina, Allan Jonathan – counsel for Respondent United States

- Milleron, Nadia – Petitioner

- Moore, Chris – Petitioner

- Nicholson, Darren P. – counsel for Individual Petitioners

- Njoroge, Paul – Petitioner

- O'Connor, Hon. Reed C. – Judge for the United States District Court for the Northern District of Texas

- O'Neill, Michael T. – counsel for Respondent United States

- Oxford, Kyle Kilpatrick – counsel for Individual Petitioners

- Pelealu, Yuke Meiske – Petitioner

- Polish Aviana Group – parent company of Petitioner LOT

- Polskie Linie Lotnicze Lot S.A. – Petitioner

- Primis, Craig S. – counsel for Respondent Boeing

- Quindos, John Karanja – Petitioner

- Rhodes IV, C. Harker – counsel for Respondent Boeing

- Rojas, Pablo – counsel for Individual Petitioners

- Roper, III, Richard B. – counsel for Respondent Boeing

- Ryan, Naoise Connolly – Petitioner

- Santos, Brandon M. – counsel for Respondent Boeing

- Schoeggl, David M. – counsel for Petitioner Smartwings

- Shapiro, Diana Gurfel – counsel for Petitioner LOT

- Smartwings A.S. – Petitioner

- Staton, Katherine A. – counsel for Petitioner Smartwings

- Stumo, Michael – Petitioner

- United States – Respondent

- Vuckovich, Adrian – counsel for Individual Petitioners

- Zen, Guy Daud Iskandar – Petitioner

Respondent The Boeing Company ("Boeing") states that it is a corporation whose shares are publicly traded (NYSE: BA).  Boeing does not have a parent corporation and no publicly held corporation owns 10% or more of Boeing's stock.

<u>s/Paul D. Clement</u>
Paul D. Clement
 *Counsel of Record*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Respondent The Boeing Company*

## STATEMENT REGARDING ORAL ARGUMENT

Boeing respectfully submits that the petitions for mandamus should be denied without oral argument.  If, however, the Court determines that oral argument would aid its deliberation, Boeing respectfully requests the opportunity to participate.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.............................................. i

STATEMENT REGARDING ORAL ARGUMENT............................... vi

TABLE OF AUTHORITIES................................................................ ix

INTRODUCTION ............................................................................. 1

STATEMENT OF THE ISSUE............................................................ 4

STATEMENT OF THE CASE............................................................. 4

      A.     Factual Background.............................................................. 4

           1.     The 737 MAX, the Misrepresentations, the Fatal Crashes, and Boeing's Response ............................... 4

           2.     The Government's Investigation and the DPA ........................ 6

      B.     Procedural History.............................................................. 8

           1.     The District Court Proceedings.................................... 8

           2.     The District Court's Decision ................................... 11

ARGUMENT ................................................................................ 12

I.     The District Court Correctly Refused To Award The Unprecedented Relief That Petitioners Request .................................................... 13

      A.     Fundamental Separation-of-Powers Principles Prohibit Courts From Exercising Substantive Authority Over a DPA............. 13

      B.     Amending the DPA to Leave Boeing's Obligations in Place While Relieving the Government's Obligations Is Not an Available Remedy for a CVRA Violation by the Government .......... 21

      C.     The District Court Correctly Denied the Other Remedies That Petitioners Seek ................................................................. 23

II.    The CVRA Does Not Extend Statutory Rights To Petitioners With Respect To The Sole Charged Offense ....................................... 25

A.     The CVRA Does Not Apply to the Individual Petitioners ................. 26

B.     The CVRA Does Not Apply to LOT and Smartwings ....................... 30

C.     LOT and Smartwings Are Barred by Laches ..................................... 31

CONCLUSION ........................................................................................................ 35

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Blakely v. Washington*,
  542 U.S. 296 (2004)................................................................14

*Imbler v. Pachtman*,
  424 U.S. 409 (1976)................................................................20

*In re Allen*,
  701 F.3d 734 (5th Cir. 2012)..................................................33

*In re Dean*,
  527 F.3d 391 (5th Cir. 2008)..................................................24

*In re Moore*,
  739 F.3d 724 (5th Cir. 2014)..................................................19

*In re OCA, Inc.*,
  552 F.3d 413 (5th Cir. 2008)..................................................22

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803) .................................................20

*Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*,
  2 F.3d 1397 (5th Cir. 1993)....................................................18

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
  572 U.S. 663 (2014)................................................................33

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
  324 U.S. 806 (1945)................................................................33

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
  842 F.3d 883 (5th Cir. 2016)..................................................34

*Rucho v. Common Cause*,
  139 S.Ct. 2484 (2019)............................................................20

*United States v. Fokker Servs. B.V.*,
  818 F.3d 733 (D.C. Cir. 2016) ...................................... *passim*

*United States v. HSBC Bank USA, N.A.*,
  863 F.3d 125 (2d Cir. 2017).......................................... *passim*

*United States v. Kim*,
  988 F.3d 803 (5th Cir. 2021)..................................................25

*United States v. Nixon,*
    418 U.S. 683,  (1974) .......................................................................... 14

*United States v. Payner,*
    447 U.S. 727 (1980) .......................................................................... 19

*Wayte v. United States,*
    470 U.S. 598 (1985) .......................................................................... 14

**Statutes**

18 U.S.C. §3161 ..................................................................................... 8, 17

18 U.S.C. §3771 ....................................................................................... *passim*

**Other Authorities**

*Polskie Linie Lotnicze LOT S.A. v. Boeing,*
    No. 21-cv-1449 (W.D. Wash. filed Oct. 15, 2021) ............................ 10

*Smartwings, A.S. v. The Boeing Co.,*
    No. 2:21-cv-00918 (W.D. Wash. filed July 9, 2021) .......................... 10

## INTRODUCTION

More than two years ago, after a lengthy and thorough investigation, Boeing and the government entered a deferred prosecution agreement ("DPA"). The DPA involved a single count of conspiracy to defraud the United States centered on misrepresentations by two Boeing employees to the Federal Aviation Administration ("FAA") in 2015 and 2016 in connection with the development of training protocols for the Boeing 737 MAX aircraft. In the DPA, Boeing accepted responsibility for its conduct and agreed to a wide range of stringent conditions, including extensive reporting requirements and ongoing government oversight of Boeing's corporate compliance programs and policies during the agreement's three-year term, and hundreds of millions of dollars in penalties and compensation. In exchange, the government agreed that if Boeing complied with its obligations under the DPA, the government would dismiss its prosecution and would not bring further charges against Boeing for the conduct at issue.

As the government recently confirmed, Boeing has honored its end of the bargain and discharged its obligations under the DPA scrupulously for more than two years. But petitioners—a group of individuals whose family members perished in two 737 MAX crashes in 2018 and 2019, and two foreign airlines—now seek to rewrite that agreement, claiming that the government (not Boeing) violated the Crime Victims' Rights Act ("CVRA"), and that Boeing must bear the consequences.

Specifically, based on the government's purported CVRA violation, the individual petitioners asked the district court to (among other things) hold a public arraignment, exercise "supervisory authority" over the DPA, and "excise" the primary benefit for which Boeing negotiated in that agreement—namely, the government's promise not to prosecute Boeing further if Boeing complied with its DPA obligations. The district court ordered a public arraignment, but denied the other remedies, explaining that it had no authority to intrude on the government's core prosecutorial function by rewriting the DPA.

That decision was plainly correct, and the petitions for mandamus should be denied. As the district court recognized (and two circuits have held), a DPA is first and foremost an exercise of prosecutorial discretion, and fundamental separation-of-powers principles prohibit a district court from rewriting its terms. The Constitution assigns prosecutorial discretion to the Executive, not the courts, and nothing in the CVRA, the Speedy Trial Act, or anything else empowers a district court to usurp that quintessentially executive function by second-guessing the terms on which the government has agreed not to prosecute. Even if a court had that authority, moreover, it would be inappropriate to remedy *the government's* CVRA violation by depriving *Boeing* of the benefit of its bargain after years of performance. The other remedies petitioners sought below are equally unwarranted, particularly given that the airline petitioners sat on their hands for years and the government has remedied

any violation vis-à-vis the individual petitioners by affording them ample opportunity to consult with the government, up to and including a personal meeting with the Attorney General.

Those remedies more than suffice, especially given that, as the government and Boeing explained below, the CVRA does not extend to petitioners at all. The CVRA can only work as intended if it applies to readily identifiable direct victims of the underlying criminal offense. To that end, the CVRA focuses on the "offense against a crime victim," and defines a "crime victim" as a person "directly and proximately harmed" by the offense. 18 U.S.C. §3771(b)(1), (e)(2). The charged offense here is conspiracy to defraud the United States, which is plainly an offense against the United States, the "directly and proximately harmed" victim of that offense. Neither the criminal information filed by the Department of Justice ("DOJ") nor the more expansive statement of facts filed as part of the DPA alleges that the offense charged caused either accident—and that is understandable, as the charged offense centers on misrepresentations made to the FAA years before the accidents regarding the development of required training, not the airplane's design. Indeed, the very fact that the district court found it necessary to hear expert causation testimony to determine petitioners' status underscores the problem, as the CVRA's goal of not delaying criminal proceedings would be frustrated if mini-trials on difficult causation questions were required.

Boeing profoundly regrets the accidents that occurred on its 737 MAX aircraft and deeply sympathizes with the crash victims and their families. Boeing fully recognizes that they have every right to pursue justice as they see fit, including through civil remedies against Boeing, and Boeing has paid hundreds of millions in compensation to date—voluntarily, pursuant to the DPA, and through civil case settlements. But they were not the victims of the statutory offense charged in the DPA. And even if the government violated the CVRA, the remedies petitioners seek against Boeing are unwarranted and unavailable as a matter of law, as the district court correctly concluded. The petitions for mandamus must be denied.

## STATEMENT OF THE ISSUE

Whether the district court correctly declined to intrude on a core prosecutorial function by refusing to revise the DPA, especially at the request of petitioners who do not qualify under the CVRA as victims of the charged offense.

## STATEMENT OF THE CASE

**A.     Factual Background.**

**1.     The 737 MAX, the Misrepresentations, the Fatal Crashes, and Boeing's Response.**

In 2011, Boeing began developing a new version of its 737 aircraft called the 737 MAX, a process that required numerous design decisions and government approvals. *See* Ryan.App.427-28. That process included, but was by no means limited to, evaluation by the FAA to determine (i) whether the airplane met federal

airworthiness standards and (ii) what minimum level of pilot training was required before a pilot could fly the airplane. Ryan.App.427-28. The FAA sub-group responsible for making the latter determination is the Aircraft Evaluation Group ("AEG"). Ryan.App.428.

In October 2018, a 737 MAX operating as Lion Air Flight 610 crashed into the Java Sea shortly after take-off, claiming the lives of 189 passengers and crew. Ryan.App.429. Investigations following the crash revealed that a software function on the 737 MAX—the Maneuvering Characteristics Augmentation System ("MCAS")—had activated during flight, precipitating further extensive disclosures to the FAA (and foreign regulators) regarding MCAS and the issuance of an FAA Emergency Airworthiness Directive addressing appropriate pilot procedures (but not grounding the plane). *See* Ryan.App.429; D.Ct.Dkt.106 at 128-29, 224-25.

Despite those measures, in March 2019, a 737 MAX operating as Ethiopian Airlines Flight 302 crashed in Ethiopia shortly after take-off, causing the death of 157 passengers and crew. Ryan.App.429. Three days later, the President ordered the grounding of all 737 MAX aircraft operating in the United States. Ryan.App.429.

The two crashes led to myriad investigations and lawsuits, and to sweeping changes at Boeing. Boeing not only made "significant changes to its top leadership," but also took concrete steps to strengthen its safety and compliance mechanisms,

including by creating a new "permanent aerospace safety committee of the Board of Directors," instituting a "Product and Services Safety organization" to "centralize the safety-related functions" previously located across Boeing, reorganizing its engineering department to have all engineers and the Flight Technical Team report through the chief engineer, and making "structural changes to the Company's Flight Technical Team" to ensure increased supervision.  Ryan.App.7.

## 2.    The Government's Investigation and the DPA.

The resulting DOJ investigation lasted over two years.  Op.4.  That investigation concluded that two Boeing employees had misled AEG in 2015 and 2016 about certain MCAS characteristics in connection with the pilot-training determination, Op.4, and that in the aftermath of the Lion Air accident one employee misrepresented his prior MCAS knowledge and misleadingly represented that AEG agreed to remove MCAS from certain materials when in fact AEG lacked relevant information, Ryan.App.44.  This misconduct was serious and unacceptable, but also specific and limited.  In particular, DOJ determined that the misconduct "was neither pervasive across the organization, nor undertaken by a large number of employees, nor facilitated by senior management."  Ryan.App.8.  Indeed, other Boeing employees had disclosed the relevant MCAS characteristics to the separate FAA division responsible for determining whether the 737 MAX met federal airworthiness standards.  Ryan.App.8.  The government's investigation did not result

in any charge with respect to Boeing's design of MCAS or any finding that the training-related misrepresentations to AEG caused the accidents.

On January 7, 2021, the government filed a one-count criminal information charging Boeing with conspiracy to defraud the United States based on misrepresentations to AEG in connection with the 737 MAX. Ryan.App.1. Boeing and the government simultaneously entered into the DPA, under which Boeing accepted responsibility for its employees' misrepresentations to AEG and committed to comply (under extensive government supervision) with a variety of stringent conditions over the DPA's three-year term. Ryan.App.3-29. Entering into the DPA enabled Boeing to demonstrate accountability, begin rebuilding relationships with regulators, and avoid the challenges and risks of trial. The DPA conditions included, among other things, that Boeing would:

- implement a compliance program meeting specific requirements described in the agreement, and review its internal controls and policies to ensure compliance, Ryan.App.16-17, 49-54;

- submit to an enhanced corporate compliance reporting regime by reporting to DOJ at no less than three-month intervals regarding the implementation of its compliance program and internal controls, and conduct at least three comprehensive reviews and reports, Ryan.App.17, 55-58;

- pay the government a $243.6 million monetary penalty, establish a $500 million compensation fund for crash victims (supplementing a $100 million fund Boeing previously voluntarily created, and without foreclosing any further award in civil litigation), and commit to $1.77 billion in compensation for Boeing's airline customers, Ryan.App.11-16; and

- not make any public statement (including in other litigation) contradicting its acceptance of responsibility, Ryan.App.22-23.

In exchange, the government agreed that if Boeing complied with the DPA's conditions for its three-year term, the government would move to dismiss its criminal information and would not bring any other case against Boeing relating to the conduct described in the DPA.  Ryan.App.16, 18.

## B.    Procedural History.

### 1.    The District Court Proceedings.

The DPA did not require district court approval to be effective.  *See United States v. HSBC Bank USA, N.A.*, 863 F.3d 125 (2d Cir. 2017); *United States v. Fokker Servs. B.V.*, 818 F.3d 733 (D.C. Cir. 2016); Ryan.App.3-29.  The government nonetheless filed the DPA with the district court on January 7, 2021, to ensure that the Speedy Trial Act would not prevent prosecution if the DPA were breached.  *See* 18 U.S.C. §3161(h)(2) (excluding "[a]ny period of delay during which prosecution is deferred … pursuant to written agreement"); *HSBC*, 863 F.3d at 130-31.

More than eleven months later, in December 2021, the individual petitioners appeared in the district court and asserted that DOJ had violated the CVRA by failing to confer with them before agreeing to the DPA.  *See* Ryan.App.431.  As remedies, the individual petitioners asked the district court to (among other things) hold a public arraignment of Boeing, impose conditions of release, and exercise "supervisory power" to "withhold approval" of the DPA unless it was "modified" to

8

impose more stringent conditions.    D.Ct.Dkt.17, D.Ct.Dkt.18 at 1, 13; *see* D.Ct.Dkt.52; Ryan.App.431.  The government and Boeing opposed those motions, explaining that the individual petitioners were not directly and proximately harmed by the charged offense and so the CVRA did not extend to them, and that the district court lacked authority to disapprove or modify the terms of the DPA.  D.Ct.Dkt.58, 60, 62.  Meanwhile, before the district court ruled, the government proactively held several meetings in early 2022 to allow the individual petitioners to voice their concerns over the DPA, including one meeting personally attended by the Attorney General.  Op.7.

In July 2022, at the DPA's midway point, the district court concluded that an evidentiary hearing was necessary to determine whether the individual petitioners were directly and proximately harmed by the charged offense.  Ryan.App.427-47. The district court eventually held a truncated hearing across two nonconsecutive days, at which the individual petitioners presented testimony from two purported experts—neither of whom had worked for FAA's AEG—to attempt to prove that the charged misrepresentations in 2015 and 2016 were a direct and proximate cause of the crashes.  The government and Boeing objected, explaining that the expert testimony was unreliable and inadequate to prove direct and proximate causation. D.Ct.Dkt.106 at 203-43.

In October 2022, the district court rejected the government's and Boeing's objections and held that the CVRA extended to the individual petitioners and that the government had violated their CVRA rights. Ryan.App.465. The district court then invited further briefing regarding appropriate remedies. Ryan.App.465.

At this juncture—nearly two years after the DPA was first filed, and nearly a year after the individual petitioners filed their motions—the airline petitioners here, Polskie Linie Lotnicze LOT S.A. ("LOT") and Smartwings a.s. ("Smartwings"), surfaced. D.Ct.Dkt.120, 141. LOT and Smartwings asserted that they too were directly and proximately harmed by Boeing's misrepresentations to AEG, and so the government violated their CVRA rights as well.[1]

In January 2023—more than two years into the three-year DPA—the district court took the unprecedented step of granting the individual petitioners' request for a public arraignment, where the individual petitioners were permitted to present oral and written statements. Op.8. At that proceeding, the government confirmed that it has continued to carefully monitor Boeing's DPA compliance and that Boeing "has complied with th[os]e requirements." D.Ct.Dkt.175 at 96.

---

[1] Unlike most of Boeing's other customers, who negotiated commercial resolutions, LOT and Smartwings brought civil suits against Boeing—still ongoing—over claims relating to the 737 MAX. *See Polskie Linie Lotnicze LOT S.A. v. Boeing*, No. 21-cv-1449 (W.D. Wash. filed Oct. 15, 2021); *Smartwings, A.S. v. The Boeing Co.*, No. 2:21-cv-00918 (W.D. Wash. filed July 9, 2021).

10

### 2.     The District Court's Decision.

On February 9, 2023, the district court issued the decision giving rise to the petitions here.  Op.1-30.  The court explained that in light of separation-of-powers principles, it had neither statutory nor inherent authority to interfere with the government's prosecutorial function by revising the DPA.  Op.12-20.  As the Second and D.C. Circuits have concluded, because the power to decide whether and how to prosecute belongs solely to the Executive, a district court is not authorized to "substantively review and withhold approval of a DPA based on disagreement with its terms."  Op.16 (citing *HSBC*, 863 F.3d at 129, 137-38; *Fokker*, 818 F.3d at 738, 740-41, 743, 746-47). The court therefore could not "withhold its approval of the DPA" or "excise from the DPA" the government's commitments, Op.10, even if it wanted to, because doing so would intrude on "exclusively Executive functions" like "criminal investigation and pre-prosecutorial negotiations." Op.19.

The court denied the individual petitioners' requests for other assorted remedies, including "ordering the Government to turn over evidence and information about Boeing's crimes and the DPA's negotiation history" and "refer[ring] the Government to appropriate investigative authorities for its violations of the CVRA."  Op.21.  As the court explained, the individual petitioners' rights "have already been substantially and meaningfully satisfied" by their subsequent opportunities to consult with the government—including a personal meeting with

the Attorney General—and by the public arraignment that the individual petitioners requested and received.  Op.21; *see* Op.22-23.  As such, the court concluded, further remedies were neither proper nor warranted.  Op.23-26 (citing *In re Dean*, 527 F.3d 391 (5th Cir. 2008)).  Finally, the court denied LOT's and Smartwings' motions as barred by laches in light of the airlines' unreasonable delay in seeking relief.  Op.26-29.

## ARGUMENT

The petitions for mandamus should be denied.  As the district court (and two circuits) have correctly recognized, fundamental separation-of-powers principles prohibit a court from second-guessing whether or how the government should bring a criminal prosecution—a function our Constitution entrusts solely to the Executive. That fundamental rule forbids courts from disapproving or modifying the substantive terms of a DPA, let alone doing so two years in.  And nothing in the CVRA, the Speedy Trial Act, or anything else empowers a court to deviate from bedrock separation-of-powers principles and second-guess the government's decision to defer prosecution.  Even if a court had such authority, it would be a complete *non sequitur* to remedy *the government's* purported CVRA violation by depriving *Boeing* of the benefit of its bargain after two years of faithful compliance with its DPA obligations.  The other remedies petitioners sought below (barely mentioned here) are equally misplaced.

And there is an additional, no less fundamental problem with petitioners' case: the CVRA does not extend to petitioners. That statute focuses on the "offense against a crime victim," limiting remedies to those "directly and proximately harmed" by the charged offense. 18 U.S.C. §3771(b)(1), (e)(2). When the offense is conspiracy to defraud the United States, it is clear from the very name of the crime that the direct victim is the United States itself. Moreover, the DPA does not find any causal relationship between the charged offense and the accidents. When the offense involves misrepresentations made to the FAA regarding the development of required training—not the airplane's design—the victims of plane crashes years later are not direct and proximate victims of the offense. Indeed, the district court's need to evaluate expert evidence to determine causation underscores that the individual petitioners are not the kind of direct, proximate, and readily identifiable victims entitled to CVRA relief. The airline petitioners face all the same problems and laches to boot. The district court correctly denied petitioners the relief they request, and this Court should deny mandamus.

## I. The District Court Correctly Refused To Award The Unprecedented Relief That Petitioners Request.

### A. Fundamental Separation-of-Powers Principles Prohibit Courts From Exercising Substantive Authority Over a DPA.

The Constitution entrusts the Executive—and the Executive alone—with the duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, §3.

Given that constitutional command, it is unsurprising that "[t]he Executive's primacy in criminal charging decisions is long settled," as "decisions to initiate charges, or to dismiss charges once brought, lie at the core of the Executive's duty to see to the faithful execution of the laws." *Fokker*, 818 F.3d at 741 (alterations omitted); *see, e.g.*, *United States v. Nixon*, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case[.]"). Conversely, judicial authority is "at its most limited" when reviewing a prosecutor's exercise of discretion over charging decisions, as "few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought." *Fokker*, 818 F.3d at 741; *see Wayte v. United States*, 470 U.S. 598, 607 (1985) ("[T]he decision to prosecute is particularly ill-suited to judicial review."). While several other countries have systems in which courts have a direct role in initiating or supervising criminal prosecutions, that is decidedly not the system the Framers adopted. *See Blakely v. Washington*, 542 U.S. 296, 313 (2004). Our Constitution leaves it to prosecutors, not courts, to decide whether and how to pursue or dismiss criminal charges.

As the Second and D.C. Circuits have recognized, those principles preclude district courts from superintending the quintessentially prosecutorial decisions

embodied in DPAs. *See HSBC*, 863 F.3d at 129 (district court's invocation of "supervisory power" to "oversee the government's entry into and implementation of the DPA … impermissibly encroached on the Executive's constitutional mandate"); *Fokker*, 818 F.3d at 743-44 (allowing courts to "scrutinize prosecutorial charging choices in the context of a DPA" would be "a substantial and unwarranted intrusion on the Executive Branch's fundamental prerogatives"). The substantive provisions of a DPA reflect "the prosecution's core prerogative" to decide whether and how "to dismiss criminal charges," based on the government's assessment of the conditions under which "additional prosecution or punishment would not serve the public interest." *Fokker*, 818 F.3d at 743. Given the quintessentially Executive nature of those decisions, a district court "has no freestanding supervisory power to monitor the implementation of a DPA." *HSBC*, 863 F.3d at 137; *see Fokker*, 818 F.3d at 744 (finding "no basis for concluding that courts have greater power to second-guess charging decisions when reviewing the terms of a DPA than when reviewing any other Executive exercise of criminal charging authority").

The district court correctly followed those principles here. As it explained, granting the relief petitioners seek—that the court exercise "supervisory authority" to "excise from the DPA" the government's commitment not to prosecute if Boeing complied with the DPA's terms, Op.10—"would likely violate separation of powers principles" by intruding on "exclusively Executive functions." Op.19; *see* Op.14

(recognizing the "worrisome separation of powers concern" that would arise if the court "stepped beyond its judicial purview"); Op.14-16 (discussing *Fokker* and *HSBC*). The court therefore properly rejected petitioners' invitation to "evaluate the substance of the [DPA] against the particular facts of this case," Op.15, and to modify the DPA to "better effect justice," Op.16.

The CVRA, Speedy Trial Act, and courts' inherent authority all comport with those fundamental separation-of-powers principles. As the district court correctly concluded, none of those sources of authority empowers courts to "impinge on the Executive's constitutionally rooted primacy over criminal charging decisions." *Fokker*, 818 F.3d at 742; *see* Op.12-20. None of petitioners' contrary arguments is persuasive. Indeed, the individual petitioners simply wish away the contrary authority, refusing to cite or acknowledge *Fokker* and *HSBC* despite the district court's reliance on them.

Petitioners invoke the CVRA provision indicating that "the court shall ensure that the crime victim is afforded the rights" that the CVRA provides. 18 U.S.C. §3771(b)(1); *see* Ryan.Pet.20-25; LOT.Pet.25-26; Smartwings.Pet.27. But nothing in that provision confers any new or additional substantive authority on the courts, much less authorizes them to intrude on the Executive's constitutional prerogatives over core prosecutorial decisions. Instead, that provision simply "imposes duties" on district courts, Op.10, to exercise the powers they *already* constitutionally possess

16

(regarding plea hearings, sentencings, etc.) to "ensure" CVRA rights are respected. 18 U.S.C. §3771(b)(1). Absent narrow circumstances where the CVRA creates new procedural vehicles (like the ability to file mandamus petitions subject to distinct rules), the CVRA takes courts as it finds them and expects them to enforce its provisions through existing authorities and subject to existing limitations. It does not, for example, authorize the re-opening of a long-final sentencing. And it certainly does not purport to provide any new authority to invert separation-of-powers principles and empower courts to superintend the Executive's prosecutorial discretion. To the contrary, the CVRA expressly provides that "[n]othing in [the CVRA] shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction." 18 U.S.C. §3771(d)(6).

The Speedy Trial Act likewise confers no substantive authority on district courts to review or amend DPA terms—and petitioners barely suggest otherwise. *See* Ryan.Pet.32-33; LOT.Pet.25 n.4. That statute sets a 70-day limit from the filing of criminal charges to the beginning of trial, but excludes (among other things) any period "during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct." 18 U.S.C. §3161(h)(2). As the Second and D.C. Circuits have held, and the district court correctly concluded, that provision does not authorize a court to "substantively

review and withhold approval of a DPA based on disagreement with its terms or leniency," let alone revise a DPA to conform with the court's own sense of what would "better effect justice." Op.16; *see HSBC*, 863 F.3d at 137-39; *Fokker*, 818 F.3d at 743-46. That is, the Speedy Trial Act does not authorize "review of the prosecution's decision to pursue a DPA and the choices reflected in the agreement's terms," *Fokker*, 818 F.3d at 744, or "imbu[e] courts with an ongoing oversight power over the government's entry into or implementation of a DPA," which would fundamentally alter "the historical allocation of authority between the courts and the Executive," *HSBC*, 863 F.3d at 138. Instead, the statute simply affords courts a limited authority to protect the defendant by "determin[ing] that a DPA is *bona fide*" and "does not constitute a disguised effort to circumvent the speedy trial clock." *Id.*; *see Fokker*, 818 F.3d at 744-45; Op.14-16. Nothing in the statute permits a court to "withhold approval of one part of the DPA," and thereby amend the DPA's substantive terms, by determining that it was "negotiated illegally." *Contra* Ryan.Pet.32-33.

For much the same reasons, courts have no inherent authority to review or amend a DPA. As this Court has emphasized, a court's inherent authority "is not a broad reservoir of power," but only a "limited source." *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1406-07 (5th Cir. 1993). While that power "permits federal courts to supervise 'the administration of criminal justice

among the parties before the bar,'" *United States v. Payner*, 447 U.S. 727, 735 n.7 (1980), it does not afford courts a "roving commission to monitor prosecutors' out-of-court activities just in case prosecutors might be engaging in misconduct," an approach that would "intrude[] impermissibly into the activities of the Executive Branch." *HSBC*, 863 F.3d at 137.

As the district court correctly explained, nothing in this record remotely suggests that the government's conduct "so transgresses the bounds of lawfulness or propriety as to warrant judicial intervention." Op.17 (quoting *HSBC*, 863 F.3d at 136); *see* Op.18-20; *cf. In re Moore*, 739 F.3d 724, 729-30 (5th Cir. 2014) (requiring "clear and convincing proof" of "bad faith or willful abuse of the judicial process" to invoke inherent sanctions authority). Petitioners assert at most that the government (not Boeing) incorrectly failed to consult them before entering into the DPA, and "recklessly misled" them about the pending prosecution. Ryan.Pet.19; *see* Ryan.Pet.16-20. But the record shows that the prosecutors did not initially confer with petitioners because they believed the CVRA did not accord petitioners victim status, *see* Op.19—a position that is legally sound, *see infra* pp.26-30, and at least reasonable given the district court's need to hold an evidentiary hearing featuring expert witnesses to establish causation and determine to the contrary, *see* Ryan.App.447. The government subsequently gave the individual petitioners ample opportunities to consult with DOJ, up to and including a meeting with the Attorney

General. *See* Op.20 (recognizing DOJ's "historic engagement" with the individual petitioners). Nothing here shows the kind of intentional and egregious abuse of the legal system that would warrant invoking a court's inherent authority at all, let alone to interfere in a quintessentially prosecutorial function by judicially revising a DPA. *See* Op.19-20.

Petitioners invoke *Marbury* for the proposition that every right must imply a remedy, and so the court must have been obligated to give them every remedy they requested. Ryan.Pet.30; LOT.Pet.27; Smartwings.Pet.29. But they ignore that they received some of their requested relief, and forget that Marbury himself was denied a remedy altogether because of limits on the Supreme Court's jurisdiction. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803). And numerous doctrines, from prosecutorial immunity, *Imbler v. Pachtman*, 424 U.S. 409 (1976), to the political question doctrine, *Rucho v. Common Cause*, 139 S.Ct. 2484 (2019), make clear that at most a right implies a remedy that is consistent with jurisdictional limits and structural principles, like a proper respect for the separation of powers. Here, the district court *gave* petitioners the remedies it viewed as available and appropriate (including a public arraignment), while withholding additional, unprecedented relief. Simply identifying a right is not enough to entitle petitioners to every remedy they have requested, and the district court correctly refused to grant relief that would

intrude into prosecutorial discretion in contravention of separation-of-powers principles and the CVRA's text.

### B. Amending the DPA to Leave Boeing's Obligations in Place While Relieving the Government's Obligations Is Not an Available Remedy for a CVRA Violation by the Government.

Even if the district court had the power to superintend the DPA's terms, the relief petitioners request here would still be wholly improper. To be clear, petitioners cannot allege that *Boeing* violated the CVRA; instead, petitioners assert only that *the government* violated the CVRA. *See, e.g.*, Ryan.Pet.1 ("the Government violated [the individual petitioners'] rights … under the CVRA"); LOT.Pet.2 ("DOJ violated the CVRA"); Smartwings.Pet.2 ("DOJ's failure to honor Smartwings' CVRA rights"). But as a remedy for *the government's* error, petitioners would deprive *Boeing* of the benefit of its bargain under the DPA, by "excising" the government's promise not to prosecute Boeing further if Boeing complies with its DPA obligations. Ryan.Pet.2. That is, as a remedy for the government's alleged misconduct, petitioners ask for a judicial revision of the DPA that would leave the government with everything it bargained for *and more*, while leaving Boeing with nothing.

That cannot be correct. The DPA has now been in place for more than two-thirds of its three-year term. *See* Ryan.App.5. As the government recently confirmed, D.Ct.Dkt.175 at 96, Boeing has faithfully complied with the DPA's stringent conditions throughout, including paying a monetary penalty of $243.6

million, committing to and paying compensation totaling over $2 billion, and revamping its internal procedures. *See* Ryan.App.11-16. Petitioners would leave all that substantial performance (and all other burdens the DPA imposes on Boeing) undisturbed, but rescind the core reciprocal promise on which Boeing relied in performing. It would be beyond improper for a court to disregard Boeing's enormous reliance interests and deprive Boeing of the central promise on which its substantial performance depended as a so-called remedy for *the government's* purported misconduct.

Nothing in ordinary "contract law principles," Ryan.Pet.30-31, permits a court to selectively amend a contract to leave one party with all the burdens but strip away its primary benefit, especially when the party deprived of its bargain is not the one who has breached the contract or the CVRA. Even assuming a court could unsettle a DPA in response to a CVRA violation, *but see supra* pp.16-19, and that the purported violation here warranted such relief, the remedy would not be to leave Boeing's obligations in place while "excising" the government's, Ryan.Pet.2, but to treat the *entire DPA*—including the terms governing compensation already paid—as "void," *In re OCA, Inc.*, 552 F.3d 413, 422 (5th Cir. 2008). Imposing that remedy would generate endless confusion and extensive litigation over how to unwind the DPA and Boeing's substantial performance. That completely unworkable result underscores not only the legal flaws in petitioners' request, but also the serious threat

that petitioners' approach poses to future DPAs, prosecutorial discretion, and separation-of-powers principles.

### C. The District Court Correctly Denied the Other Remedies That Petitioners Seek.

The district court also correctly rejected petitioners' other requested remedies. As the court recounted, the individual petitioners also asked to "enforce their conferral rights" by ordering the government to "turn over evidence and information about Boeing's crimes and the DPA's negotiation history," and to "refer the Government to appropriate investigative authorities for its violations of the CVRA." Op.21. The individual petitioners barely mention those requested remedies in this Court, *see* Ryan.Pet.2 (referring generally to "other remedies to enforce their CVRA rights"), and for good reason. Nothing in the CVRA provides victims a right to force the government to let them review its files, let alone confidential records regarding the negotiation and supervision of a DPA. Moreover, while the referral remedy would at least be directed at the party who allegedly violated the CVRA, nothing in the record shows the kind of egregious and intentional government wrongdoing that would warrant referral. *See* Op.20, 24-25.

In any event, as the district court correctly concluded, the individual petitioners' asserted rights under the CVRA "have already been substantially and meaningfully satisfied," making any further relief "inappropriate." Op.21. As the court explained, the individual petitioners have now had extensive consultations

23

with DOJ—including the Attorney General in person—and the ability to speak extensively at the arraignment.  Op.22-23.  As this Court's precedent demonstrates, the individual petitioners' subsequent "substantial and meaningful participation" provided an adequate remedy.  *In re Dean*, 527 F.3d 391, 395 (5th Cir. 2008) (per curiam); *see* Op.22-23.

The individual petitioners' attempts to distinguish *Dean* are unavailing.  While *Dean* applied the traditional mandamus standard, *see* Ryan.Pet.26, its holding turned on the determination that further relief would be "inappropriate under the circumstances," 527 F.3d at 395, which is true here for the same reasons.  And contrary to what the individual petitioners suggest, the district court did not "misunderst[an]d" *Dean*'s procedural posture, Ryan.Pet.26; instead, it correctly held that here as in *Dean*, subsequent proceedings after the alleged CVRA violation have "give[n] meaningful effect" to any asserted CVRA rights.  Op.23; *see Dean*, 527 F.3d at 395-96.  The CVRA gave victims a long-overdue seat at the table, but it did not provide victims' advocates everything they wished for; it accommodated the rights of criminal defendants, the interests of prosecutors, and the limits on judicial review.  The district court did likewise in striking a balance that gave individual petitioners a meaningful remedy, while acknowledging Boeing's substantial reliance

interests and the limited judicial role in superintending DPAs.  There is no basis to overturn that judgment.[2]

## II.    The CVRA Does Not Extend Statutory Rights To Petitioners With Respect To The Sole Charged Offense.

For all the foregoing reasons, the district court correctly determined that petitioners are not entitled to the relief they seek.  But this Court can also deny the petitions for another fundamental reason: the CVRA does not apply to petitioners at all.  That statute applies only to offenses "against" a victim, and extends its enumerated statutory rights only to persons "directly and proximately harmed" by the charged offense.  18 U.S.C. §3771(b)(1), (e)(2)(A).  That text demands careful attention to the offense charged.  In this case, the relevant offense (conspiracy to defraud the United States) itself identifies the direct and proximate victim of the crime—the United States, specifically the FAA's AEG, to which the misrepresentations that underlie the charged offense were made.  The CVRA does not extend beyond that direct and proximate victim to afford rights to petitioners.

---

[2] Smartwings' request for an accounting of the airline compensation Boeing paid under the DPA, *see* Smartwings.Pet.11-12, likewise fails as a matter of law.  It belongs to the government, not Smartwings or the court, to decide whether Boeing is complying with the DPA by properly making such payments.  *See* Ryan.App.19; *supra* pp.14-15.  And the CVRA's right to "full and timely restitution *as provided in law*," 18 U.S.C. §3771(a)(6) (emphasis added), applies only when the law provides for restitution (upon conviction), not to DPAs.  *See, e.g.*, *United States v. Kim*, 988 F.3d 803, 811 (5th Cir. 2021) (restitution depends on the "offense of conviction").

### A.    The CVRA Does Not Apply to the Individual Petitioners.

Boeing profoundly regrets the accidents and the unspeakable losses that the individual petitioners have suffered.  Boeing also fully recognizes that the individual petitioners have the right to seek justice as they see fit, including through civil litigation against Boeing.  But there is a critical difference between being a victim of the crashes that occurred in 2018/2019 and having statutory rights under the CVRA arising from misrepresentations to a division of the FAA years earlier.  *See* D.Ct.Dkt.58 at 9-14.  The individual petitioners are not the direct and proximate victims of that charged offense.

The CVRA requires that in court proceedings involving any "offense against a crime victim," the crime victim should be "afforded the rights" that the CVRA provides.  18 U.S.C. §3771(b)(1).  The relevant offense here is clear:  In the criminal information initiating this case, the government charged Boeing with "Conspiracy to Defraud the United States," alleging that Boeing conspired "to defraud the United States by impairing … the lawful function of a United States government agency, to wit, the Federal Aviation Administration … in connection with [its] evaluation of the Boeing 737 MAX."  Ryan.App.1.  That leaves no doubt that the offense here is an "offense against" the United States, specifically the FAA's AEG.  18 U.S.C. §3771(b)(1).

The same result follows from the CVRA's statutory definition of "crime victim." Under the CVRA, "crime victim" means "a person directly and proximately harmed as a result of the commission of a Federal offense." *Id.* §3771(e)(2)(A). Once again, the person "directly and proximately harmed" by a conspiracy to defraud the United States via misrepresentations to AEG is the United States and AEG. *Id.* The individual petitioners are unquestionably direct victims of the airplane crashes in which their loved ones perished, but they are not direct victims of the offense that was charged here. The statement of facts in the DPA does not find any causal connection between the accidents and the charged offense, which involved misrepresentations to the FAA regarding the development of required training—not the airplane's design—made years before the accidents. An attempt to connect those misstatements made in 2015/2016 to the accidents years later requires several highly disputable (and disputed) causal inferences—anything but the "direct and proximate" causation that the statute requires.

The proceedings below prove the point. In the district court's view, determining whether the individual petitioners qualified as crime victims under the CVRA necessitated a separate evidentiary hearing to allow the individual petitioners to present expert evidence to attempt to prove the tenuous causal chain they asserted. The very fact that the court considered that collateral proceeding necessary only underscores the absence of the direct and proximate causation that the CVRA

envisions, and the strong reasons why the government's own assessment of victim status should not be lightly second-guessed. Requiring district courts to conduct evidentiary hearings and weigh putative expert evidence to decide who falls within the CVRA's scope is entirely incompatible with the need for quick and readily ascertainable classification of victims that the statute requires on its face. The speed and finality that the CVRA mandates—requiring DOJ to identify crime victims and district courts to "take up and decide any motion asserting a victim's right forthwith," and setting an exceptionally tight 72-hour presumptive deadline for deciding any appeal, 18 U.S.C. §3771(d)(3)—cannot be reconciled with an expansive view of direct and proximate causation that would require a drawn-out, contentious process to determine who qualifies as a "crime victim" in the first instance.[3]

Complex causation disputes about whether a particular design feature or misrepresentation "caused" an accident years later are well suited for civil litigation with extensive discovery, *Daubert* hearings, and the like. But they are a complete misfit for criminal proceedings where direct victims must be identified and afforded their rights expeditiously. Indeed, the need for expedited consideration creates the temptation to conduct the kind of truncated and one-sided proceedings that occurred

---

[3] Indeed, holding otherwise could require pre-trial victim identification hearings even when defendants plead the Fifth and refuse to testify at all, and potentially compromise governmental secrecy interests related to grand jury investigations if such hearings were required before charging.

below (where only the individual petitioners put on experts). Proceedings like those—on a far more limited record than comparable civil litigation would afford—cannot resolve complex causation questions like the one presented here, and there is simply no practical way for courts and DOJ to apply the CVRA if determining its scope requires contested testimony at evidentiary hearings.[4]

The substance of petitioners' expert testimony below only underscores that the individual petitioners are not direct and proximate victims of the offense charged. In the district court's view, that testimony showed that the misrepresentations about MCAS to AEG led AEG to certify the 737 MAX for pilots subject to FAA jurisdiction with Level-B flight training; which led other countries to adopt equivalent training standards and omit information regarding MCAS from their training materials; which led the pilots on the flights that crashed to receive training that did not mention MCAS; which prevented them from avoiding the crashes when MCAS repeatedly activated based upon erroneous angle-of-attack information. Ryan.App.458-61. That already attenuated causal logic sidesteps several intervening

---

[4] Particularly in the DPA context, such collateral hearings put a corporate defendant in an untenable position: it must respond to a collateral challenge to whether *the government* violated the CVRA, addressing causation questions that may be simultaneously at issue in pending civil litigation, all while trying to demonstrate its acceptance of responsibility and rebuild its relationship with regulators. If such proceedings became the norm, it would seriously discourage future negotiated resolutions involving corporate defendants.

events and complicated questions, including whether AEG would have established different training requirements even if it had received complete information about MCAS's parameters; whether foreign regulators would also have adopted such training standards, *see* D.Ct.Dkt.106 at 180-82; the role of other contributing factors identified in official government reports on the accidents, such as an incorrectly installed sensor and unaddressed maintenance issues on Lion Air Flight 610, *id.* at 220-24; and whether different training or training materials, even if they had been required, would have prevented the accidents, given the widespread knowledge throughout the "entire aviation community" about MCAS after the first crash and AEG's decision despite that knowledge not to mandate additional pilot training at that time, *id.* at 128-29, 224-25. In short, the extended chain of events between the charged misrepresentations to AEG in 2015/2016 and the crashes in the Java Sea in 2018 and Ethiopia in 2019 is exactly the kind of indirect and attenuated causation that the CVRA does not allow and cannot allow if it is to be at all administrable.

### B.    The CVRA Does Not Apply to LOT and Smartwings.

For similar reasons, the CVRA does not apply to LOT and Smartwings. The charged offense of conspiracy to defraud the United States was committed "against" the United States, not two foreign airlines, and LOT and Smartwings were not "directly and proximately harmed" by that offense.    18 U.S.C. §3771(b)(1), (e)(2)(A); *see* D.Ct.Dkt.150 at 2-3, 6-10; D.Ct.Dkt.151 at 2, 4.

Neither airline asserts that any of their 737 MAX planes were actually involved in any accident, or that any of their employees or customers were physically injured by the aircraft. Instead, they claim they were harmed because after the second crash, the European Union Aviation Safety Agency ("EASA") grounded their 737 MAX aircraft. *See* D.Ct.Dkt.120 at 3; D.Ct.Dkt.141 at 1-2. That causal chain depends not only on the extended sequence of events described above leading up to the two crashes, but also on the subsequent decision by an international aviation regulator to ground the specific airplane model involved—a decision that implicates a complex mix of considerations. After all, most airplane crashes do not result in groundings—the last previous global grounding in response to a fatal airplane accident occurred over twenty years ago, in August 2000. *See* D.Ct.Dkt.150 at 8. Especially in light of the numerous intervening events, EASA's eventual decision to ground the 737 MAX cannot plausibly be described as a direct and proximate consequence of the charged misrepresentations to the FAA years earlier. Indeed, the grounding decision suggests that no amount of training would have sufficed and that the concerns had more to do with design concerns or other factors far removed from the misrepresentations to AEG that underlie the charged offense.

### C.    LOT and Smartwings Are Barred by Laches.

Finally, as the district court correctly concluded, LOT and Smartwings are barred by laches. For nearly two years after the DPA was filed—and nearly a year

after the individual petitioners filed their first motions—the airlines made no attempt to appear before the district court and assert their purported rights. That extended inaction is powerful practical evidence that even LOT and Smartwings did not consider themselves direct and proximate victims of the charged offense. They only claimed to be victims after the district court issued its opinion holding that the CVRA applied to the individual petitioners—a transparent attempt to capitalize on that holding. As the district court correctly determined, LOT's and Smartwings' delay is plainly inexcusable and prejudicial to the government and Boeing, as allowing them to proceed at this late date would potentially require prolonging the DPA "well beyond its expected expiration date," forcing Boeing and the government to expend further resources in complying with and monitoring that agreement, and disrupting their settled reliance interests. Op.27-28. Allowing LOT and Smartwings to invoke their purported CVRA rights now would not only be improper, but would set a deeply problematic precedent that would threaten the viability of DPAs generally.[5]

None of the airlines' contrary arguments is persuasive. Both airlines claim laches does not apply because the CVRA does not explicitly mention laches or contain a specific time limit for asserting victim status. LOT.Pet.13-16;

---

[5] Contrary to Smartwings' contention, Smartwings Pet.17-18, Boeing explicitly invoked laches in opposing LOT's and Smartwings' motions. *See* D.Ct.Dkt.150 at 14 n.11 (asserting laches against LOT); D.Ct.Dkt.151 at 2, 4 (explaining that Smartwings' motion "should be denied for the same reasons").

Smartwings.Pet.14-16. That gets matters exactly backwards, as laches applies *precisely* when Congress "has provided no fixed time limitation." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 (2014); *cf. In re Allen*, 701 F.3d 734, 735 & n.1 (5th Cir. 2012) (recognizing that the CVRA imposes "no time bar" on seeking victim status, and expressly reserving whether "inconvenient delay … could trigger the doctrine of laches"). Moreover, while the CVRA does not have an explicit time limit, its applicability only to direct and proximate victims of the crime charged—properly applied—itself eliminates most timeliness concerns. As long as the CVRA is so limited, the prospect for late-appearing victims is minimal. But if petitioners' causation theories are accepted, crimes will have new victims years after the crime has been committed, and one indirect victim's causation theory may embolden others to appear years later still.

Both airlines argue that Boeing cannot assert laches due to "unclean hands," LOT.Pet.18-20, Smartwings.Pet.18-19, but the purported inequitable conduct they assert (the charged offense) has nothing to do with their delay in asserting their rights and would mean laches never applies in the CVRA context, where by definition the defendant is charged with criminal conduct. *Cf. Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945) (unclean hands "does not demand … blameless lives as to other matters"). Finally, both airlines argue that the district court incorrectly found unjustifiable delay and prejudice. LOT.Pet.20-23;

Smartwings.Pet.19-24.  But "the application of laches is reviewed" only for "abuse of discretion," and "the district court's findings of delay, inexcusability, and prejudice are findings of fact that can be overturned only if they are clearly erroneous," *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 898 (5th Cir. 2016).  LOT and Smartwings come nowhere near showing any such abuse of discretion or clear error.

## CONCLUSION

This Court should deny the petitions for mandamus.

Respectfully submitted,

s/Paul D. Clement

BENJAMIN L. HATCH
BRANDON M. SANTOS
McGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(757) 640-3727

MARK R. FILIP
CRAIG S. PRIMIS
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
(202) 879-5000

JEREMY FIELDING
KIRKLAND & ELLIS LLP
1601 Main Street
Dallas, Texas 75201
(214) 972-1770

PAUL D. CLEMENT
  *Counsel of Record*
C. HARKER RHODES IV[*]
MARIEL A. BROOKINS[*]
CLEMENT & MURPHY, PLLC
706 Duke Steet
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

[*]Supervised by principals of the firm who
are members of the Virginia bar

*Counsel for Respondent The Boeing Company*

March 27, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF COMPLIANCE**

I certify that:

1) This brief complies with the type-volume limitation of Fed. R. App. P. 21(d)(1) because it contains 7,740 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32.2.

2) This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

3) Any required privacy redactions have been made pursuant to Circuit Rule 25.2.13, the electronic submission is an exact copy of the paper submission, and the brief has been scanned for viruses using Windows Defender and is free of viruses.

March 27, 2023

<u>s/Paul D. Clement</u>
Paul D. Clement